Donald A. CALKINS and Karl J. Jacobs, Plaintiffs,

v.

James M. HARE, Secretary of State for the State of Michigan, Defendant,

Alvin M. Bentley, Intervenor.

Civ. A. No. 22720.

United States District Court
E. D. Michigan, S. D.
March 26, 1964.

Theodore Sachs, Rothe, Marston, Mazey, Sachs & O'Connell, Detroit, Mich. (Harold Norris, Detroit, Mich., of counsel), for plaintiffs.

Frank J. Kelley and Robert A. Derengoski, Lansing, Mich., for James M. Hare, Secretary of State for State of Michigan.

William B. Cudlip, William Gerald Warren, and Richard C. Van Dusen, Philip Weiss, Detroit, Mich., Norman L. Des Jardins, Owosso, Mich., for Alvin Bentley.

Before O'SULLIVAN, Circuit Judge, and SMITH and ROTH, District Judges.

TALBOT SMITH, District Judge.

The plaintiffs have challenged the constitutionality of the congressional districting in this state.

The action had been started on June 29, 1962, plaintiffs alleging in their original bill of complaint that the congressional districts then established (by Act 20, P.A.1931, as amended by Act 64, P.A. 1951) were unconstitutional. A preliminary injunction was denied by this court on July 10, 1962. In June, 1963, effective September 6, 1963, the Michigan Legislature enacted the congressional districting bill now under challenge, Act 249, P. A.1963. Following the decision in the case of Wesberry v. Sanders, (1964), 84 S.Ct. 526, plaintiffs, upon leave granted, amended their complaint, now attacking the constitutionality of the most recent act, No. 249, P.A.1963, in the light of Wesberry.

A hearing was had on March 2, 1964, upon the motion for preliminary injunction. Plaintiffs based their case upon the population figures, from the 1960 census, for the various districts, pointing out the various discrepancies thus disclosed, and asserting, upon the authority of Wesberry, that constitutional requirements had not been met. The Attorney General, appearing for defendant Secretary of State, conceded that the criterion of "one man, one vote" had been, *prima facie*, violated and could offer no explanation of the reasons for the population variances shown "without an examination of the legislative history" of the Act. The intervening defendant was represented by counsel whose relationship to the Act under consideration was of substantial aid to the Court, he having (in 1962) "entered full time public service, when one of my objectives was to achieve the redistricting of Michigan on a basis as nearly to population as practicable". (Tr. 64) His explanation of the criterion employed by the Legislature in drawing the district lines was illuminating:

"* * * But so far as the Legislature was aware when it took action in 1963—and it was one of the most difficult accomplishments of that Legislative Session, the objective of equal population was satisfied if it hit a 15 per cent standard, and with the exception of the Fifteenth District and the Upper Peninsula District and ignoring some fractional deviations—there are some that go a fraction over 15 per cent—they came within that standard for all but two of the districts of the state, and they hit an average deviation of less than 10 per cent. * * *"

It was also suggested to the Court that a proper element of "practicability" was consideration of the legislative problem of just what kind of districting the Legislature would accept, in short, what bill the votes could be obtained for.

At this juncture it was the opinion of a majority of the Court that a *prima facie* showing of unconstitutionality had been made, that the motion for preliminary injunction should be denied, and that the matter be set down for hearing on the merits on March 23rd. The parties were cautioned by the Court to consider the matters of proof upon the merits—"it will be for them to decide whether they wish to make any factual showing

of the considerations that went into the apportionment as it was made for the purpose of asserting that the apportionment was done within reasonable and practicable limits obedient to the Constitution of the United States." (Tr. 92)

We have now held the hearing on the merits. No testimony was tendered by any party. The Attorney General stated to the Court that no legislative history of the challenged Act was available. The intervening defendant argued the contents of his brief. The plaintiffs did likewise. Upon the showing thus made the Court considered the matter as submitted.

The Plaintiffs, then, have challenged the constitutionality of the congressional districting in this state.[1] They point out that certain districts in the Detroit area alone differ in population by over a hundred thousand,[2] that there is a variation from the smallest to the largest district in the State of almost two hundred thousand,[3] and that the Wayne County (Detroit area) districts average 444,000 persons, whereas the out-state average is approximately 397,000. Even if apportionment were based upon some factor other than population it would be impossible, in our judgment, to justify such variations in the Wayne County area alone. Thus, geographically, there are no intervening mountain ranges between districts, as in Colorado, no rivers or plains. Yet some districts in the County of Wayne (Thirteenth and Fifteenth) have the greatest debasement of vote values found anywhere in the state, while another district in the County, a suburban area adjacent to the Thirteenth, namely, the Fourteenth, has the third-greatest enhancement of voting power in the state. Thus the fact of residence in the Fifteenth District means that one's vote is diluted more than in any other district in the state, while a few miles away, in the Fourteenth District, one's vote is weighted higher than in any of other areas in the state, save two.[4]

That a constitutional right is involved is clear. Art. I, § 2 of the United States Constitution, "that Representatives be chosen 'by the People of the several States' means that as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's."[5] The intervening defendant professes to find in Wesberry a "strange inconsistency". If the clause above quoted, we are told, "means what it says, then *raw population statistics* are irrelevant" and *"voting population"* becomes relevant. (All emphasis in original). To make his point, intervening defendant cites the vote for Secretary of State in Wayne County in 1962. Just why this official's vote was selected, among the host of others running, including a Governor, does not appear. Or why registered voters were not used, or persons over 21 eligible to vote. Each of such latter categories might find theoretical justification. But we are a District Court. We take Wesberry as our precedent. It is apparent from the majority opinion that this issue had consideration in the Supreme Court in Wesberry, since Justice Harlan's dissenting opinion (n. 4) raises this precise question—"Is the number of voters or the number of inhabitants controlling?" The answer, in our judgment, is found again and again in the Wesberry opinion, from the opening paragraph, referring to the 1960 census by districts and averages and refer-

---

1. Act 249, P.A.1963, Mich.Stat.Ann.Cum. Supp. § 4.22 et seq.

2. Fourteenth District, 372,624; Thirteenth, 474,133.

3. Fifteenth District, 494,068; Eleventh District, 305,984.

4. The Index of Representation is the measure of a district's representation, relative to the ideal. It is determined by dividing the average population per district (411,790), by the actual population of the district under consideration. Thus the Fifteenth District, with, a population of 494,068, has an Index of Representation of 411,790 divided by 494,068, or 83.35%. The Fourteenth District, with a population of 372,624 has an Index of Representation of 110.-51%.

5. Wesberry v. Sanders, (1964), 84 S.Ct. 526.

ring to "this inequality of population", to the closing paragraph which speaks of "equal representation for equal numbers of people." We find no inconsistency in the opinion.

In our consideration of this case, we start with the principle that the right of franchise is "a fundamental political right, because preservative of all rights".[6] This being the case we do not equate the presumption of constitutionality in this situation to that employed in the general police power cases, involving the regulation of health or morals, or the fixing of guide lines for a state's experimentations in matters of social welfare or economic controls. In these cases the states are properly given a wide latitude.[7] But where we are concerned with a basic constitutional right our requirements are infinitely more rigorous. Here the cloak of constitutionality is not loosely worn. There is little elbow room for freedom of movement. The fit must be precise. We do not experiment with freedom of speech, freedom of worship or freedom to vote. These are among the basic civil rights of man. Cf. Skinner v. State of Oklahoma, 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942).

Plaintiff here has established that gross population inequities exist in the congressional districting of this state. To us it is inexplicable, for example, that there should be a difference of almost a hundred thousand people between the adjacent Thirteenth and Fourteenth Districts in Detroit. At this point the burden is upon the State to come forward with some rational explanation for what has been done.[8] In reply we are told by the Attorney General that he "has been unable to find any committee reports or legislative debates which reveal the specific causes or reasons which led to the formation of the congressional districts provided in Act 249 and must forego any factual presentation as to this aspect of the matter."

The intervening defendant is but little more helpful. He argues principally the questions raised in footnote 4 to the dissenting opinion of Mr. Justice Harlan in Wesberry. However persuasive these considerations may have been in conference in the Supreme Court prior to the Court's vote on the case, they are of little help to a District Court that is attempting to apply the Wesberry decision, not to rehear it.

Two arguments are suggested by intervening defendant in addition to Mr. Justice Harlan's questions. He states, without documentation or proof of any kind, that the Legislature took into account population trends in creating certain districts, and asks if the Legislature were not "entitled to anticipate a further drop" in the population of some districts and further growth in others. The difficulty with the argument made is that it

---

6. Yick Wo v. Hopkins, 118 U.S. 356, 370, 6 S.Ct. 1064, 1071, 30 L.Ed. 220 (1886).

7. E. g., Railway Express Agency v. People of State of New York, 336 U.S. 106, 69 S.Ct. 463, 93 L.Ed. 533 (1949).

8. Mann v. Davis (E.D.Va.1962) 213 F. Supp. 577, 584: "* * * Plaintiffs here proved the inequity of the allotment of representatives on the basis of population. Thereupon the burden to adduce evidence of the presence of other factors which might explain this disproportion passed to the defendants. But none was forthcoming, if indeed it was available. * * *"

See, also, Maryland Citizens Comm. for Fair Cong. Redist. v. Tawes (D.Md.1964) 226 F.Supp. 80, 81: "* * * In our view the burden rests initially on the plaintiffs to show unconstitutionality, but when the mathematical imbalance between districts is of sufficient magnitude the burden shifts to the defendants to justify the disparity. Where the vote of a citizen in one district counts for significantly less than a vote in another district, as is manifestly now the case in Maryland, the disproportion rebuts the presumption of the constitutionality of the statute and requires the State to show that there is a rational basis for the disproportion. * * *"

Cf. Bates v. City of Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960): "* * * Where there is a significant encroachment upon personal liberty, the State may prevail only upon showing a subordinating interest which is compelling. * * *"

is totally devoid of any tie to the realities of the case at bar. No proofs are before us, merely questions and conclusions, all of which are disputed or denied by plaintiffs. Any districting, however disparate with respect to population, may conceivably be justified by saying that the Legislature expected the area to either shrink or to grow. If such a suggestion, without more, suffices to justify gross population disparities, then an easy answer to a constitutional denial has indeed been found. We do not intimate that population trends either are or are not significant and useable. But the difficulty in respect of their use is that a basic constitutional right may be lost to a speculative future event, an unequal trade at best and at worst a cynical deprivation. The proof of a "trend" must be compelling, immediate, and inescapable to justify disfranchisement. We find here, on the other hand, no proofs whatever. As a matter of fact the point is not raised in the intervening defendant's answers.

■ The intervening defendant urges also that in construing Wesberry's "as nearly as practicable" language, we should take into account that "if it appears to the court that the 'fundamental goal' of the legislature and the governor in the enactment of an apportionment statute was 'equal representation for equal numbers of people,' then the courts should not substitute their judgment for that of these elected officials. What may seem clearly practicable to a three-judge court, or an eight-judge court, or a nine-judge court may not be realistically practicable for 144 elected representatives of 8,000,000 people." (Brief of Intervening Defendant, page 15) The point here, as

made abundantly clear upon oral argument, is that if you can't get the votes for equal districts, you have done the best you can and the courts should stay out of it. This is a pre-Baker v. Carr,[9] indeed pre-Brown v. Board of Education,[10] argument. It is self-answering.

Finally, it is urged to us that despite unexplained and apparently unexplainable variations between districts of tens,. fifties, and, even, a hundred thousand,[11] there is, after all, an "average departure" of only 9.2% from equality. We do not propose to be drawn into a sterile controversy over averages and percentages, whether 9%, 15% or other. We do not measure constitutional rights in these terms. They set up wholly false standards. That the average man gets due process in our courts does not justify railroading some luckless scoundrel every now and then. Nor is it an answer to a charge of unconstitutional disfranchisement that only 10,000 people are deprived of their right to vote, this being but a small percentage of the entire voting population. These 10,000 have a right to vote equally with others, no matter what percentage of the total they comprise. We take this to be as clear as the proposition that none of our people can be denied their free right of worship no matter how small the sect, and that none of our people shall be deprived of their right of free speech, no matter how obnoxious to most of us their doctrines.

The short of the matter is that a citizen can either vote equally with his peers or he cannot. If he cannot, and we find that he cannot with respect to congressional elections in Michigan, his constitutional rights have been abridged. The

9. 369 U.S. 186, 208, 82 S.Ct. 691, 7 L.Ed. 2d 663 (1962).

10. 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

11. E. g. Fifteenth District, 494,068; Eleventh District, 305,984. The intervening defendant explains the large Fifteenth District figure by, in part, stating that an error in tabulating had included in the Fifteenth the City of Southgate, with a population of 29,404 persons. The er-

ror remains uncorrected at this time. As to the Eleventh District, the intervening defendant points out, in a "practicability" argument, that it comprises the entire Upper Peninsula of Michigan, and only this area. Yet for some three decades the old 11th Congressional District (even before the Mackinac Bridge) spanned the Straits and included lands on both sides. of it. Impracticability of including land in the Lower Peninsula is obviously not the answer.

statute here complained of is unconstitutional.

The constitutional guideline may be simply stated: the Legislature may not "draw the lines of congressional districts in such a way as to give some voters a greater voice in choosing a Congressman than others." [12] A man's vote may not be taken from him. It may not be diluted or debased, nor, on the other hand, magnified nor enhanced. Our Constitution's "plain objective" is that of making "equal representation for equal numbers of people the fundamental goal for the House of Representatives." [13] One factor and one alone is controlling, the factor of population. [14] It is true that the Wesberry court speaks of one vote being "as nearly as practicable" worth that of another, but we do not see in these words an escape hatch for the reluctant. Nor in the caveat that the weight of votes need not be mathematically precise. What is meant here is merely that the ideal district lines enclosing mathematically equal areas of population may make minor departures here and there from such ideal, in accordance with the needs of the situation, and without "unnecessarily" (Wesberry, page 535) abridging the people's rights. But these are minor concessions to practicability, the avoidance of ideal mathematical precision, merely. They are the application in this field of the well-known *de minimis* doctrine. Should the concessions made result in substantial (not minimal) and unnecessary inequalities between the districts, the lines of unconstitutionality will have been crossed. This concept of equality, which some profess to find so puzzling, is not an alien doctrine, newly imported to our shores. Long before Wesberry, we knew of the doctrines of equal rights and opportunities, of equal treatment in our courts, and of equal schooling for our children. We need not exhaust the litany. If there is one dominant social and political belief held by all our people, it is that we are

both free *and* equal. Its implementation with respect to voting rights should present no insurmountable obstacles to those minded to pursue it.

The matter of remedy remains. It is urged to us that it is now too late for remedial action by the Legislature in time for the forthcoming congressional elections and that our citizens must rest with their disfranchisement until the elections in 1966, a period of over two years. This we cannot accept.

Of course, as Judge Brown of the Fifth Circuit held for the Court in Bush v. Martin (S.D.Tex.1963), 224 F.Supp. 499, aff'd and remanded, *per curiam*, sub nom. Martin et al. v. Bush, 84 S.Ct. 709 (1964), "the easy way out is either to take no action or formally to defer action * * *. But this Court no less than the Supreme Court of the United States is charged with serious obligations under Art. III of the Constitution and under the implementing statutes of Congress to afford to litigants appropriate relief in vindication of constitutional and civil rights. We must therefore balance the relative advantages, disadvantages, the relative injuries to the parties, and perhaps even more so to the whole State * * *." (224 F.Supp. at 513)

Upon balance, therefore, we have a deprivation of the constitutional rights of thousands of our people, remedial by setting up districts of equal population. As against these interests, it is urged to us that the matter is one of such extreme complexity that the Legislature either cannot or will not act without delay, thus forcing the state into undesirable elections at large.

The need for and propriety of immediate relief is evident when consideration is given to the obvious advantage, (1) to the people of the state, whose interests are our primary concern, and who have a right to expect stability and continuity in the districts in which they reside, and in their representation in the

---

12. Wesberry, supra, 84 S.Ct. page 533.

13. Wesberry, supra, page 535.

14. " * * * it was population which was to be the basis of the House of Representatives." Wesberry, supra, page 530.

Congress; (2) to the incumbent congressmen who are entitled to have a determination of their districts and a designation of the people they are expected to service; and (3) to those persons who may wish to become candidates for the office of congressman, who should not be exposed to imminent prospective changes in district lines and constituencies.

It is true, of course, that the Legislature may refuse or neglect to amend the now-specified dates for certain steps in the electoral process; it may refuse or neglect to reapportion in accordance with the Constitution; or, having done so, it may refuse or neglect to give such reapportionment act the immediate effect it should have in order to insure to our people the basic rights involved and avoid an election at large. We do not assume that any of these refusals or neglects will take place, preferring, rather, to assume that the Legislature will act with alacrity once its constitutional duty is made clear to it. But should, regrettably, the Legislature so fail the people, our duty becomes the greater, not the lesser. Under such circumstances, the "vindication of constitutional and civil rights," which it is our duty to sustain, can be accomplished only through the process of election at large, a procedure the choice of which will rest with the elected representatives of the people.

We do not read the *per curiam* opinion in Martin v. Bush, supra, as a nationwide directive to the District Courts to leave things be. The District Court opinion in Martin pointed out that under Texas law, "reapportionment must be accomplished by February 3, 1964." Yet the case in the Supreme Court was not reached and decided until a month after February 3, 1964; namely, until March 2, 1964. We do not see how the Supreme Court could, as it put the matter, "in the light of the present circumstances," have done other than remand with the instructions embodied in it. In our case, however, there is ample time to act, should the Legislature be so minded, as we believe they should be and are.

The constitutional deprivation is clear and the legislative duty is manifest.

ROTH, District Judge, concurs.

### DECREE

This cause came on for trial on March 23, 1964 at which time all parties were present by counsel and the Court having considered the pleadings, the stipulations, and the arguments of counsel, and, the Court being of the unanimous view that Act 249 of Public Acts of 1963 is unconstitutional, and, a majority of the Court being of the view that a decree should now be entered in the terms as hereinafter set forth, it is therefore ordered, adjudged and decreed by the Court:

*First*: The Court hereby decrees that the present apportionment of Congressional Districts under Act 249, Public Acts of 1963, is unconstitutional and therefore the said Act 249 is void and invalid in its application;

*Second*: That in conducting primaries for the nomination of candidates for, and elections for the election of, Members of Congress from Michigan, the defendant Hare, individually and in his official representative capacity, his respective agents, officers and employees, are hereby enjoined and restrained from enforcing, applying or following the said Act 249 of the Public Acts of 1963;

*Third*: Pending enactment by the State of Michigan of substitute legislation in the place of said Act 249 of the Public Acts of 1963, all Members of Congress for the State of Michigan shall be nominated and elected from the State at large;

Judge O'Sullivan concurs in the view that Act 249, Public Acts of 1963, is unconstitutional but dissents from the entry of a decree at this time with the remedies provided in paragraphs Second and Third for the reasons set forth in an opinion filed contemporaneously herewith;

*Fourth*: The Court retains jurisdiction of the cause for such other and further orders as may be required.

The Opinions of the Court will follow in due course.

O'SULLIVAN, Circuit Judge (concurring in part and dissenting in part).

I concur in the view of my brothers of the majority that, in the light of Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, Act 249 of the Public Acts of Michigan, Session of 1963, violates Art. I, § 2 of the Constitution of the United States. It will be sufficient for me now to say that I consider that the Wesberry case commands such a holding.

I cannot, however, join my brothers in the remedy they choose to implement our holding. Unable to persuade them to my position, I feel I should speak separately. I would order the Michigan Legislature to reapportion, but would allow it adequate time in which to do so. Even though the pressure of time denies me opportunity for careful and contemplative study and better composition, I am constrained to now say why I do not join my brothers in the remedy they decree. In my view, the command they place upon the Legislature and the election officials of Michigan is needlessly and dangerously precipitate.

The decree they propose impresses me as evidencing undue haste to place heavy burdens upon a branch of Michigan's government that is entitled to the respect we would like to have accorded to us. As a court of equity we are not expected to, nor should we, be vindictive in the relief that we accord to litigants.

This action was originally commenced on June 29, 1962. We were asked to strike down the then Michigan Congressional apportionment statute, and to issue commands not unlike what my brethren have now decreed here. Petitioners' then request for an injunction was, however, closer to imminent primary election dates than is the situation now before us. We refused to act without a longer time to consider the matter. The 1962 Congressional elections then went ahead. Recognizing that a charge of unconstitutionality had been lodged against the then existing Congressional Apportionment Act, and aware of Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663, the Michigan Legislature set about, with study, legislative deliberation and partisan contesting, to formulate a new apportionment of Congressional Districts. This was accomplished on June 13, 1963, by adoption of Act 249, now under attack.

There has been no showing that in considering and adopting this Act, the Michigan Legislature was flouting law already announced or proceeding otherwise than within the then known "guidelines" as furnished by Baker v. Carr. It appears that except for making Michigan's Upper Peninsula a single Congressional District and some mathematical errors in Wayne County, whatever departures there are in Act 249 from strict mathematical equality are within the limits then thought to be permissible by the American Political Science Association. The Act thus constructed was promulgated on June 13, 1963. No attempt was then made to revive this litigation to charge that the new 1963 Act was unconstitutional. This case remained dormant from July 10, 1962, until the Wesberry v. Sanders decision came down from the United States Supreme Court on February 17, 1964. On March 2, 1964, the plaintiffs here were given leave to amend their complaint to attack the 1963 Act in the light of Wesberry. This Court shortened the time ordinarily allowed to bring a cause to issue and trial and heard this case on March 23, 1964.

My brothers would now issue a mandatory injunction under which the 110 members of the Michigan House of Representatives and the 34 members of the Michigan Senate would have to, (notwithstanding whatever other important problems of state government now occupy their time and abilities,) proceed forthwith to construct a plan of apportionment *suitable to us* "or else". The "or else" is an election at large. We, however, furnish them no "guidelines"— a now much-used word in contemporary judicial literature. We tell them only

that they must insure that *"as nearly as is practicable* one man's vote in a Congressional election is to be worth as much as another's."[1] A search for just what is "as nearly as is practicable" is presently taxing the minds of judges and professional political scientists.[2] Neither of the plaintiffs, political science professors, nor their knowledgeable counsel, have offered any guidelines that we could, through our decree, pass on to the non-professionals who make up our Legislature. Thus, we hand them no small task to be accomplished, against an uncertain dead line.[3] This they must do, lest we apply the lash of our judicial whip. My respect for the men who make up our state Legislature forbids my placing them under such an interdiction without giving them an adequate opportunity for orderly and deliberative legislative procedure. It is unreal to expect sound legislation from a Legislature thus proceeding *in terrorem.*

Becoming restraint has always marked equity's employment of its extraordinary writs. There is nothing about the facts of this case that should, in my view, cast us in the role of avenging angels. The vice which we now find in Act 249 is actually much less than what has been traditional in the great majority of the states of the Union in the many years that comprise the political history of Michigan[4] and the United States.[5] We now find errors in the practices of such

history. This fact, however, does not, in my view, compel us to command almost instant action by the complex machinery of a state government lest the setting of tomorrow's sun leave unrepaired even one small error. I would be ill at ease in such an enterprise.

We should never withhold our writs when serious damage would flow from such withholding, nor should we hesitate to command instant obedience when public good or private right call for it. But such is not the case before us. The malapportionments that were involved in the cases we follow, Wesberry v. Sanders and Martin v. Bush, were glaring in comparison to the Act we now strike down.[6] Taking into account the imbalance that resulted from Michigan's Upper Peninsula being given one Congressman and mathematical errors in Wayne County, the maximum disparity between the extremes under the Act before us is 1.6 to 1. The average disparity runs about 1.092 to 1. I cannot believe that toleration of this disparity for a reasonable time would be a wrong commensurable with the burdens that the majority's writ would place on the Michigan Legislature. Likewise, the immeasurable wrong to the voters of the entire state which would follow an order that the coming elections be at large, far outweighs quixotic and dramatic vindication of the hypothetical voter whose vote

1. Literal, exact and possibly quick conformance to the suggested formula could be accomplished with the help of a staff of surveyors and mathematicians. Nineteen Districts of various sizes and shapes could be outlined so as to have 411,790 people contained within each District. All agree, however, that such a performance would not be "practicable" or desirable.

2. Distinguished members of the Supreme Court of Michigan, with becoming deference, await the arrival of "guidelines" to help them resolve a somewhat allied problem. In Wesberry itself, the Supreme Court refrained from a definition of its own words, "as nearly as practicable."

· 3. We seem to have no exact information of when the Legislature must complete its work. The Secretary of State's answer

to the application for a preliminary injunction says that the earliest date on which he may give notice for the Congressional Primary is May 5, next, and that he may defer such notice to June 5, 1964. We assume, too, that by hasty revision of Michigan's election laws some further time might be provided.

4. Michigan's apportionment during the time that Congress required equality of population in Congressional Districts contained larger departures than we deal with here.

5. See Appendix, Wesberry v. Sanders.

6. In Wesberry, the range from the most to the least populous district was from 823,680 to 272,154. In Martin v. Bush, these figures were 951,527 to 216,371.

might be diluted to the extent of the above ratios.[7]

New definitions and new guidelines have put the Federal Courts into position of unprecedented power over state legislatures. The respect that we owe to our coequals in the grand scheme of our government suggests avoiding unseemly displays of power or the flexing of our judicial muscles.

The landmark case of Baker v. Carr began its journey in the Federal Courts sometime prior to July 31, 1959. Since then it has been considered in decisions reported at 175 F.Supp. 649 (D.C. July 31, 1959); 179 F.Supp. 824 (D.C. Dec. 21, 1959); on the Supreme Court level as Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (Mar. 26, 1962); and on remand at 206 F.Supp. 341 (D.C. June 22, 1962); and 222 F.Supp. 684 (D.C. Oct. 10, 1963). As of the date of the last decision, October 10, 1963, an acceptable reapportionment of the Tennessee Legislature had not been accomplished. But no elections at large have been held in Tennessee.

Baker v. Carr was first argued in the Supreme Court on April 19, 1961, and was set for reargument on October 9, 1961. On March 26, 1962, the Supreme Court spoke its views in some six separate opinions. Scholle v. Hare, 360 Mich. 1, 104 N.W.2d 63, began its journey in the Michigan courts some time prior to its first decision, expressed in five separate opinions on June 6, 1960. Upon remand, it was decided in July, 1962, through six separate opinions by the members of the Court. Scholle v. Hare, 367 Mich. 176, 116 N.W.2d 350. It still pends in the United States Supreme Court. Wesberry was first reported as Wesberry v. Vandiver, D.C., 206 F.Supp. 276, on June 20, 1962. It was reversed by the United States Supreme Court just short of two years later. Bush v. Martin, D.C., 224 F.Supp. 499 (affirmed by the Supreme Court on March 2, 1964) decided October 19, 1963, gave the Texas Legislature until February 3, 1964, to reapportion. Such order was stayed, pending appeal, by Mr. Justice Hugo Black, and such stay continues in force. At this writing, we do not know what the Texas District Court will ultimately do.

Thus are exposed the complex questions of apportionment and the time taken by learned judges to come near to a final resolution of them. The writ which my brothers employ will give the sharply divided Michigan Legislature from now, March 26, to some time in June, to come to a common definition of "as nearly as practicable" and to construct a plan of apportionment that will be approved by the majority, or more likely two-thirds, of the members of both houses. The forbearance that I recommend has been in practice in most of the Federal Courts which were faced with the situation here involved.[8] It may be argued that now there is a clear standard, but the debate as to what is "as near as practicable" continues.

I would in this case make a finding that Act 249, P.A.1963, is unconstitutional, but would stay final judgment until the Michigan Legislature has had proper time to reapportion to conform to Wesberry or any other more definitive decision that may soon be forthcoming from the United States Supreme Court. I would allow the 1964 Congressional elections to be conducted under the present law. Such forbearance would in no event, however, extend beyond such time

7. No one, in this law suit, has attempted a projection to demonstate that Michigan's Congressional delegation would be substantially different under a hastily reconstructed apportionment statute from what it would be under Act 249.

8. Baker v. Carr, 206 F.Supp. 341 (M.D. Tenn., 1962); Maryland Citizens Committee for Fair Congressional Redistricting, Inc. v. Tawes, 226 F.Supp. 80 (D. Md., Mar. 21, 1964); State of Wisconsin v. Zimmerman, 209 F.Supp. 183, 188, 189 (W.D.Wis., 1962); Nebraska League of Municipalities v. Marsh, 209 F.Supp. 189, 195, 196 (D.Neb.1962); Lisco v. McNichols, 208 F.Supp. 471, 478, 479 (D. Colo., 1962); Moss v. Burkhart, 207 F.Supp. 885, 898 (W.D.Okl., 1962).

as we consider essential in order to insure the holding of the 1966 Congressional elections under an apportionment plan acceptable to us. It might be, notwithstanding our forbearance, that the Michigan Legislature, advised of our holding that Act 249 is invalid, will be able to enact a new statute in time for the 1964 elections. I would, however, leave that in their hands.

It might be suggested that if a stay is in order, application therefor can be made to the United States Supreme Court. I think we are sufficiently informed to determine this on our own, without adding to the now adequate burdens of that Court and its members.