Charles **BAKER** et al., Plaintiffs,

v.

**Joe C. CARR** et al., Defendants.

Civ. A. No. 2724.

United States District Court
M. D. Tennessee,
Nashville Division.

June 22, 1962.

Z. T. Osborn, Jr., Nashville, Tenn., Walter Chandler, Memphis, Tenn., Hobart F. Atkins, Knoxville, Tenn., for original plaintiffs.

Ben West, Mayor, City of Nashville, Tenn., Harris Gilbert, Robert Jennings, Jr., City Atty., Z. T. Osborn, Jr., Nashville, Tenn., Charles S. Rhyne, Washington, D. C., for intervening plaintiffs.

E. K. Meacham, J. W. Anderson, City Atty., Chattanooga, Tenn., for City of Chattanooga, Tenn.

George F. McCanless, Atty. Gen., Milton P. Rice, David M. Pack, Asst. Attys. Gen., State of Tennessee, Nashville, Tenn., for original defendants.

Edwin F. Hunt, Nashville, Tenn., for intervenor defendant, Tennessee Farm Bureau Federation, Inc.

C. R. McClain, Director of Law, Knoxville, Tenn., City of Knoxville, Tenn.

Cecil Branstetter, Nashville, Tenn., Tennessee State Labor Council, AFL–CIO.

Before WEICK, Circuit Judge, and BOYD and MILLER, District Judges.

## PER CURIAM.

This action is before the Court upon remand from the Supreme Court following its ruling that federal courts have jurisdiction of actions involving invidious discriminations in the distribution of state legislative seats. Baker et al. v. Carr et al., 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663. It was specifically held by the Supreme Court (a) that this Court possessed jurisdiction of the subject matter; (b) that a justiciable cause of action was stated upon which plaintiffs would be entitled to appropriate relief, and (c) that the plaintiffs have standing to challenge the Tennessee apportionment statutes.[1]

Upon receipt of the mandate from the Supreme Court on April 23, 1962, notice was given by the Court to the attorneys of record that a pre-trial conference would be held on May 7, 1962, for the purpose of discussing and considering the issues of fact and law to be tried, amendments to pleadings, identification of exhibits and documents, possible stipulations of fact, and any additional matters calculated to expedite the conclusion of the litigation. The order calling for the pre-trial conference stated that the Court would consider at the time of the conference motions which any party desired to file.

At the conference the Attorney General of Tennessee, appearing for the original defendants, stated that he had been authorized to advise the Court that the Governor of Tennessee would issue a call for a special session of the General Assembly to consider the question of legislative reapportionment in view of the ruling of the Supreme Court in the present case. He thereupon moved for a stay of any further proceedings herein until the General Assembly of Tennessee had convened in special session and had acted upon the matter of legislative reapportionment. A ruling on this mo-

---

1. Since the remand other citizens and voters having standing equal to that of the original plaintiffs have been permitted to intervene to join the original plaintiffs in attacking the constitutionality of the Tennessee legislative apportionment statutes. Similarly, additional parties having an interest in claiming the validity of such apportionment statutes have been permitted to intervene as defendants.

tion was reserved by the Court, and June 11, 1962 was set as the date for a further hearing to consider all questions involved, including motions by any party. In the meantime, a vacancy having occurred in the original three-judge court due to the death of Circuit Judge John D. Martin, the present three-judge court was constituted by the Chief Judge of the Sixth Circuit.

Pursuant to the call of the Governor the General Assembly convened in extraordinary session in Nashville on May 29, 1962, and enacted two separate acts reapportioning legislative seats. Public Chapter No. 1, Extraordinary Session of 1962, reapportioning seats in the House of Representatives, was passed on June 6, 1962. Public Chapter No. 3, reapportioning Senate seats, was also passed on June 6, 1962. Both acts were approved by the Governor on June 7, 1962.

The question now presented to the Court upon motion for summary judgment is whether the two 1962 statutes reapportioning legislative seats in the General Assembly of Tennessee are constitutional when measured in terms of the requirements of the equal protection clause of the Fourteenth Amendment to the Federal Constitution.[2]

Having heard extensive arguments by the attorneys for the respective parties on June 11, 1962, and having fully considered the record, our views with respect to each Act will be set forth followed by a statement as to the procedural steps to be taken to correct the deficiencies which have been found to exist in the respective statutes.

## GUIDING CONSTITUTIONAL PRINCIPLES

■ In its opinion in the present case the Supreme Court, although not specifying exact standards or criteria under the equal protection clause for testing the sufficiency of legislative apportionments, did indicate certain guidelines which are applicable and controlling in assessing the 1962 statutes here in question. Thus in the majority opinion the Supreme Court, in referring to the plaintiffs' claim, stated that such claim was in substance "that the 1901 statute constitutes arbitrary and capricious state action, offensive to the Fourteenth Amendment in its irrational disregard of the standard of apportionment prescribed by the State's Constitution or of any standard, effecting a gross disproportion of representation to voting population." It was further stated that "the injury which appellants assert is that this classification disfavors the voters in the counties in which they reside, placing them in a position of constitutionally unjustifiable inequality vis-à-vis voters in irrationally favored counties." 369 U.S. at pp. 207–208, 82 S.Ct. at p. 698. The crux of the Court's ruling was that a claim so characterized presents a justiciable cause of action of which federal courts have jurisdiction. It would clearly appear, therefore, that if a state legislative classification for apportionment purposes is wholly irrational and arbitrary, supported neither by the standard of the state nor by any other standard, it is outside the permissible limits of the Fourteenth Amendment. This view of the test to be applied in the present case is borne out by the concurring opinion of Mr. Justice Douglas in his reference to "egregious injustices," by the concurring opinion of Mr. Justice Clark in which he states that while mathematical equality among voters is not required, "there must be some rational design to a state's districting," by the concurring opinion of Mr. Justice Stewart in which he states that the com-

2. All interested parties, immediately upon approval by the Governor of the two reapportionment statutes, agreed that the pleading should be amended so as to bring into issue the constitutionality of the new reapportionment statutes and that the question should be presented to and heard by the Court at the hearing which had previously been set for June 11, 1962. Amendments were made accordingly. The amended motion for summary judgment was based upon stipulations of fact, admissions in the pleadings, and facts of which the Court could take judicial notice.

plaint in the present case asserts that "Tennessee's system of apportionment is utterly arbitrary—without any possible justification in rationality," and finally by the repeated references in the majority and concurring opinions to the proscription by the equal protection clause of "invidious discriminations."

It is in accordance with these governing principles that the apportionment statutes now in issue are to be evaluated. Do the statutes establish classifications predicated upon a rational basis, or are they utterly arbitrary and lacking in rationality? There can be no doubt that the majority of the Supreme Court ruled in this case, as stated by Mr. Justice Clark, at least *sub silentio,* that invidious discriminations were present in the 1901 reapportionment statute and that it fell far short of the standards of the equal protection clause. This was the view of the defendants at the pre-trial conference when they stated that they would not attempt to defend the 1901 statute, Acts 1901, c. 122.[3]

The question before us is whether the invidious discriminations, obviously present in the 1901 statute, have been removed by the 1962 reapportionment statutes. We consider, first, the Act reapportioning seats in the House of Representatives (Public Chapter No. 1, Extraordinary Session of 1962). While this Act eliminates or mollifies some of the most glaring inequities referred to in the Supreme Court's majority and concurring opinions, and while it can be explained in some of its major features upon a basis which we are not prepared to say at this time is within itself irrational, it nevertheless possesses some inequities and inequalities which in our opinion should be corrected or removed

in order to avoid grave doubts as to its constitutionality.

## THE HOUSE OF REPRESENTATIVES

The Constitution of Tennessee, Article 2, Section 5, provides that the ninety-nine members of the House of Representatives, at the several periods of making the enumeration, shall be "apportioned among the several counties or districts, according to the qualified voters in each," with the proviso that any county having two-thirds of the ratio shall be entitled to one member.[4] With some exceptions to be commented upon hereinafter, the act reapportioning the House follows the plan of the Tennessee Constitution in allotting to those counties having two-thirds the ratio[5] a direct representative. The same two-thirds principle is extended by the 1962 Act to floterial districts comprising two or more counties.[6] The result of this extension of the two-thirds rule to floterial districts is, of course, to take some seats away from larger counties and districts. One reason for the rule embodied in the Constitution of the state is to afford a measure of protection to governmental units or subdivisions of the state not having a sufficient number of voters to equal the full ratio but yet having a substantial population and possessing significant and substantial interests in state legislative policy. Such a state plan for distribution of legislative strength, at least in one house of a bicameral legislature, cannot, in our opinion, be characterized as per se irrational or arbitrary. And we think the same conclusion follows if this principle is extended in the same legislative house of a bicameral legislature so as to afford substantial representation to smaller counties by classifying

3. This is shown by order of May 16th entered pursuant to the pre-trial conference.

4. At the pre-trial conference it was agreed that "qualified voters" should be determined by the number of persons twenty-one years of age and older as shown by the 1960 Federal Census, and this was the basis used in the enactment of the reapportionment statutes in the special session of the Legislature.

5. As shown by the 1960 Federal Census there are 2,092,891 persons twenty-one years of age and older in the state thus giving the House with ninety-nine representatives a ratio of 21,140 qualified voters. Two-thirds the ratio is 14,093.

6. Under the Act, by extension of the two-thirds rule, some sixteen floterial districts having a number less than the full ratio, are given a representative.

or arranging them in floterial districts. We find no basis for holding that the Fourteenth Amendment precludes a state from enforcing a policy which would give a measure of protection and recognition to its less populous governmental units. These subdivisions constitute an integral and historic part of the state's governmental structure. They have real and substantial interests in the state's laws, and the state could reasonably conclude that its best interests would be subserved by their effective participation in state government and in the formulation of its laws and policies. The state has the right, if it sees fit, to assure that its smaller and less populous areas and communities are not completely overridden by sheer weight of numbers.

However, while we do not disapprove of the application of the two-thirds principle, as such, and its extension to floterial districts, we think that certain discrepancies and inequities in the Act reapportioning the House should be pointed out. For example, Fayette County having 11,652 voters is awarded a direct representative, while Loudon County with 14,054 qualified voters is represented only by being permitted to participate in the election of a floterial representative with Blount County having 32,849 qualified voters. Sevier County [7] with 14,011 qualified voters elects a direct representative while nearby Loudon County with more qualified voters participates in a floterial district only. Another inequity would appear to be the treatment of Anderson County having 33,554 qualified voters.[8] It is given a direct representative, but although it has 12,000 voters in excess of the ratio, it is not allowed to participate in a floterial district. Yet Rutherford County with 30,347 qualified voters, after being given a direct representative, is allowed to participate in the election of two floterial representatives, each with Cannon and DeKalb Counties having 5,235 and 6,660 qualified voters respectively. Wilson County with 17,012 qualified voters, less than the ratio of 21,140, has a direct representative and, in addition, is permitted a floterial representative with Smith County having 7,654 qualified voters and Jackson County having 5,578 qualified voters. Sumner County with only 21,776 voters, slightly in excess of the ratio, is given not only a direct representative but also participates in the election of a floater with Macon and Trousdale Counties, having 7,527 and 3,027 voters respectively.

## THE SENATE

██ The 1962 Act reapportioning the State Senate is devoid of any standard or rational plan of classification which we are able to discern. It creates thirty-three senatorial districts for election of the constitutionally prescribed number of thirty-three senators, making no pretense to equality or substantial equality in numbers of qualified voters. Nor are the districts created by the Act equal or even remotely equal in area. There are also wide variations in the numbers of counties lumped together in the respective districts. The conclusion is irresistible that the apportionment wrought by the 1962 Act with respect to the Senate can only be described, to use the apt phrase of Mr. Justice Clark

7. It may be true, as argued by the defendants, that Fayette and Sevier Counties are the only counties in the state which, under the two-thirds principle, are not entitled to a direct representative on the basis of voting strength but which would, under the principle, be entitled to a direct representative on the basis of total population. For this reason it is argued that the Legislature could reasonably make an exception in the case of these two counties and award them direct representatives. The difficulty with this argument is that these are the only instances in the 1962 statutes, both with respect to the House and the Senate, where resort was had to total population instead of voting strength.

8. After the remand qualified voters of Anderson County and the Mayors of Oak Ridge and Clinton located in that county were permitted to intervene as plaintiffs, to challenge the 1962 reapportionment statutes.

in his concurring opinion in this case, as a "crazy quilt." It is inexplicable either in terms of geography or demography. Neither can it be explained upon the theory that it seeks to give equal or substantially equal representation to governmental subdivisions or units. A few examples will suffice to demonstrate the soundness of these conclusions.

As to population the senatorial districts have a spread between the 21st District with a voting population of 35,-773 and the 6th Senatorial District with a voting population of 92,777.[9] Between these extremes there is no consistent pattern of voting population as between the various districts. Aside from the so-called urban counties of the state (Shelby, Davidson, Hamilton, Knox and Sullivan), the senatorial districts in rural East Tennessee have on the average approximately double the voting populations of the rural districts of Middle and West Tennessee, yet they receive no greater representation. For example, in East Tennessee the 7th District has 71,-856 qualified voters; the 3rd District, 77,477; the 4th District, 79,801. These districts are primarily rural in character. But in rural Middle Tennessee the 21st District, as already noted, has a voting population of 35,773. The 20th District has 38,108 qualified voters; the 19th District 38,180; the 23rd District 38,-448; and the 22nd District has 39,812. In rural West Tennessee the districts increase to some extent in voting population, varying from 40,306 in the 28th District to 51,119 in the 25th District, but still with substantially less than the average for the rural districts in the eastern part of the state. It is apparent that as far as population is concerned the senatorial districts in the middle part of the state are heavily favored as compared with comparable districts in the eastern part of the state, and sub-stantially favored over similar districts in the western part of Tennessee.

On an area basis there are similar disparities. In terms of square miles, excepting for the moment the so-called urban counties, the districts vary from the 15th District with 3,577 square miles to the 19th District with 1,025 square miles. There is no consistent pattern of size between these two extremes. Thus the 19th Senatorial District has the same representation in the Senate as the 15th even though it has less than one-third the square miles of that district and only slightly more than one-half the population. Similar discrepancies can be found throughout the entire apportionment both as to area and as to population.

Neither is there any consistency to be found in the number of counties grouped together for the purpose of constituting a senatorial district. The urban counties referred to above are represented by one or more senators, but outside of these areas the districts vary from those having as few as two counties, such as the 6th, the 19th, the 24th, and the 27th, to districts with as many as nine counties, as in the case of the 15th District. Between these extremes, two districts are made up of six counties, five districts are made up of five counties, seven districts are made up of four counties, and two districts are made up of three counties.

Not only are there wide discrepancies as between rural areas of comparable character but disparities also exist as between urban areas. Thus in Hamilton County one senator is allotted for 71,489 qualified voters, whereas in the 6th Senatorial District (Knox and Anderson Counties) there is one senator for each 92,772, a variation of about twenty-three percent. There is an even wider variance between Sullivan County with 67,121 and

---

9. The total voting population of the 6th District (Knox with 151,999, and Anderson with 33,554) is actually 185,553. However, Knox County alone comprises the 5th District and elects a senator. Since the two counties together elect two senators, the figure 92,777 represents voting population per senator for the two counties in the 6th District.

Knox and Anderson Counties with 92,-772.[10]

We conclude that the Act reapportioning the Senate of Tennessee is utterly arbitrary and lacking in rationality. Its only consistent pattern is one of invidious discrimination.

## THE REMEDY TO BE APPLIED

■■■ In considering the remedy which should be applied to correct the inequalities and inequities which we find to exist in the 1962 reapportionment of legislative strength in Tennessee, we begin with the view that there should be a minimum of judicial intrusion by federal courts into the governmental affairs of the state consistent with an effective enforcement of the plaintiffs' rights to equal protection of the law under the Fourteenth Amendment to the Federal Constitution as envisaged by the landmark opinion of the Supreme Court in the present case. Federal courts should be ever conscious of the necessity of preserving the integrity and independence of state governments, and should exercise an appropriate degree of restraint to permit them the widest possible latitude in conducting their internal affairs and in solving their own governmental problems. Nevertheless, federal courts would be derelict in their duties and would abdicate their proper responsibilities under our federal system of government if they hesitated or failed to take necessary remedial action to protect the individual citizen in the enjoyment of personal and civil rights guaranteed to him by the Federal Constitution. The protection of the individual in the enjoyment of such rights is just as vital and important as is the preservation of the integrity of the states. Every effort must be made to accord the fullest measure of recognition and protection to both interests.

■■■ With these general observations in mind we have sought to formulate a remedy which we feel will lead to the vindication of the plaintiffs' rights and at the same time afford the state a full opportunity to exercise its own prerogatives without federal intrusion. Several alternatives have been considered. One method would be to declare the 1962 apportionment statutes unconstitutional and allow another opportunity to a legislature elected under the 1901 Apportionment Act to adopt another apportionment. This alternative is met with a number of objections which have led us to the conclusion that it should not be accepted. In the first place, legislatures elected under the 1901 apportionment have defaulted in their duties and responsibilities in regard to apportioning the state for over fifty years. And when called by the Governor into the recent extraordinary session for the purpose of re-examining the problem, the General Assembly, while making some corrections, failed to eliminate the long-standing evil of malapportionment.

Furthermore, if the 1962 statutes should be declared unconstitutional, it would follow almost automatically that the 1901 statute would have to suffer a

---

10. We have considered the defendants' argument that apportionment of senate seats is based upon the rational plan of allotting three seats to each of the nine congressional districts and then distributing the remaining six seats among the congressional districts having the largest area. There are many reasons for the unsoundness of this theory. First, the real test is whether there are invidious discriminations as between the state senatorial districts and not whether congressional districts have been alloted a fair number of senatorial districts. Second, there are manifest inequalities and discriminations as between congressional districts in the allotment of state senators. Third, congressional districts are not provided with equal representation as they are in the case of representatives in the lower house of the Congress. Fourth, a plan for apportioning state senate seats must be tested as to its validity under the equal protection clause upon its own merits without regard to districts created for an altogether distinct purpose. Fifth, in any event, if this was the basic plan of apportioning the Senate, it was not followed in the 1962 Act, for the reason that the remaining six seats were not allotted to congressional districts on the basis of area.

similar fate. For the 1901 Act is concededly more discriminatory than the 1962 Acts. It would be somewhat incongruous, to say the least, to declare one law unconstitutional in order to revert to another which is even more objectionable.

Another possibility would be to declare the 1962 statutes unconstitutional, and then for the Court itself to formulate an apportionment plan to be enforced by injunctive process. Other alternatives suggest themselves, but considering all of the relevant factors we have concluded that the expedient course to pursue is to afford the General Assembly of Tennessee elected under the 1962 statutes an opportunity at its 1963 session to enact a fair and valid reapportionment in Tennessee. Cases in which a similar procedure was used are Magraw v. Donovan, D.C.Minn. (1958), 163 F.Supp. 184; Toombs v. Fortson, N.D.Ga., 205 F.Supp. 248 (involving legislature of Georgia); and the recent Alabama case of Sims v. Frink, D.C., 205 F.Supp. 245.

We have confidence that a legislature so elected, having before it the views of the Court herein set forth, as the recent legislature did not, will adopt a plan of reapportionment which will comply with the commands of the Federal Constitution.

In that connection, however, we think that it is proper that we should indicate with some degree of concreteness the minimal standards which, in our opinion, will be required to meet this test. Considering that the Constitution of Tennessee, with the exception of the two-thirds principle applicable to the House of Representatives, provides for the distribution of legislative strength in both Houses on the basis of qualified voters; that apportionment in both houses of the legislative branch on the basis of numbers of persons has been a part of the organic law of the State of Tennessee under each of its three Constitutions since it was admitted to the Union in 1796; that this basic principle or standard of state law has been systematically and persistently disregarded and ignored by the legislature since 1901, notwithstanding substantial changes and shifts in population as set forth in the opinion of the Supreme Court in the present case; that the less populous areas and communities of the state have an important place in the political and governmental life of Tennessee; and considering all other relevant and pertinent facets of the problem, we are of the opinion that if the two-thirds principle should be applied and used in apportioning seats in the House of Representatives, either by applying it to counties or floterial districts, or to both, then it would follow that the Senate would have to be apportioned on the basis alone of numbers of qualified voters. Contrariwise, if the Senate should be apportioned on an equitable and rational basis not fully related to voting strength, it would be necessary to apportion the House of Representatives on the basis of numbers of qualified voters alone, without regard to the two-thirds principle whether applied to counties or districts or both.

It is noteworthy that the 1962 statutes fail to apportion either house on the basis of qualified voters. In addition to individual inequities and inequalities present in both statutes, the net result is to perpetuate a "gross disproportion of representation to voting population." We find in the context of this case that equal protection requires that such condition be eliminated and that apportionment in at least one house shall be based, fully and in good faith, on numbers of qualified voters without regard to any other factor.

Concededly, cases of this character pose many problems in connection with the appropriate remedial measures to be taken. These problems, however, are not insurmountable, for the principle is basic that once a court assumes jurisdiction of a cause of action it possesses the power to afford effective relief. In this case the Supreme Court left no doubt that this principle has full application to cases of state legislative malapportionments, and that it did not intend to send the case back to this court merely

as an idle gesture. Having asserted this Court's jurisdiction of plaintiffs' claim, the Court concluded its historic opinion by stating that "the right asserted is within the reach of judicial protection under the Fourteenth Amendment." We construe this statement as implying that we are under a positive duty to take such protective and remedial steps as will enforce the plaintiffs' rights to equal protection of the law. The choice of possible remedies is a very wide one and involves a large measure of judicial discretion, not only because of the nature of the rights asserted and the injury inflicted, but also because of the Court's equitable and declaratory judgment jurisdiction. It must be apparent, therefore, that if the General Assembly fails to act or if it should act in a manner violative of the Fourteenth Amendment, this Court will be under a clear and unmistakable duty to take such steps as will effectively accomplish the enforcement and vindication of the constitutional rights of the plaintiffs.

■ To permit the General Assembly itself to correct the shortcomings of the 1962 reapportionment we must deal with the decision of the Supreme Court of Tennessee in Kidd v. McCanless, 200 Tenn. 273, 292 S.W.2d 40. A careful reading of the opinion in that case discloses that the actual holding was that "if the Act of 1901 is to be declared unconstitutional, then the de facto doctrine cannot be applied to maintain the present members of the General Assembly in office." Such a declaration or "striking down" of the 1901 Act would, the Court concluded, leave the state without a legislature and the means of electing a new one "and ultimately bring about the destruction of the State itself."

Basically, the Tennessee Supreme Court's view of the de facto doctrine appears to rest on the proposition that a body or officer in order to act validly under the de facto principle must act in "good faith," and that such good faith could not exist where the body or agency "knows of the want of authority" from

a judicial "declaration" of invalidity or a "striking down" of the statute under which it was created.

Even if we are bound in this proceeding to accept the state's view of the de facto doctrine, a proposition which may be doubted since we are enforcing the paramount demands of the Federal Constitution, we find and hold that the de facto rule of Kidd v. McCanless, supra, is without application if we express our views as to the 1962 statutes and expressly withhold final judgment on all issues, including a declaration of invalidity, the issuance of an injunction, or otherwise, until the General Assembly has acted at its 1963 session. This will permit the election of a state legislature under the 1962 statutes with full authority and power to discharge validly and legally the legislative functions of the state. It will enable the General Assembly to act with the express sanction of the Court to effect the necessary remedial measures and consequently in "good faith" as far as its authority is concerned. Under such conditions the restrictive view of the de facto rule announced in Kidd v. McCanless will not apply. If it should be argued that this is a somewhat technical method to circumvent the ruling in that case, the answer is threefold: First, Kidd v. McCanless itself represents a rather technical effort by a Court to avoid entering an area which courts then generally regarded as involving political and nonjusticiable issues, a view now undercut by the Supreme Court's decision in this case. Second. This remedial method has the advantage of avoiding a far more drastic form of relief which could conceivably entail a direct intrusion into state affairs. Third. It is justifiable on the basis of the wide latitude of discretion resting in the Court in devising remedies in cases of this type.

Accordingly, an order will be entered reserving final judgment herein on all issues until the 1963 General Assembly constituted and elected under the 1962 statutes has had an opportunity at its regular 1963 session to act on the matter of legislative apportionment, but not lat-

er than June 3, 1963. After that date, or after the date of adjournment of the General Assembly if occurring prior to June 3, 1963, the case may be reopened upon application of any party or upon the Court's own motion. However, notwithstanding such time limits for reopening, full jurisdiction is retained, and the order will provide that if necessary or proper for any reason, the action may be reopened at any time hereafter, either upon the Court's own motion or upon the application of any party.