921 P.2d 1182

Sam NISHITANI, Personal Representative Under the Will and of the Estate of Walter John MacLean, also known as Walter John MacClean, Deceased, Plaintiff–Appellee,

v.

Frederick Hering Kekaulike BAKER, Jr., also known as Pali Kekaulike Wong, and Haunani Young–Baker, also known as Yvonne Haunani Wong, Defendants–Appellants,

and

Ke'opi'o O Puna, et al., Additional Defendants.

No. 16372.

Intermediate Court of Appeals of Hawai'i.

June 28, 1996.

282

Frederick Hering Kekaulike Baker, Jr. and Haunani Young–Baker, Hilo, defendants-appellants pro se.

Timothy Lui–Kwan, Sherrill Atwood and Charles Heaukulani (Carlsmith Ball Wichman Murray Case Mukai & Ichiki, of counsel), on the brief, Hilo, for plaintiff-appellee.

Before BURNS, C.J., and WATANABE and ACOBA, JJ.

WATANABE, Judge.

In this foreclosure action, Defendants–Appellants Frederick Hering Kekaulike Baker, Jr., also known as Pali Kekaulike Wong, and Haunani Young–Baker, also known as Yvonne Haunani Wong, husband and wife (collectively, Defendants), appeal from the Third Circuit Court's July 7, 1992 Order Approving Report of Commissioner, Confirming Sale of Real Property at Public Auction, and Directing Distribution of Proceeds (July 7, 1992 Order), in favor of Plaintiff–Appellee Sam Nishitani (Plaintiff), Personal Representative Under the Will and of the Estate of Walter John MacLean (MacLean),[1] deceased.

We affirm.

## I. BACKGROUND

### A. Facts

This dispute involves several parcels of real property located in the Puna district on the island of Hawai'i.

1. Walter John MacLean (MacLean) was also known as Walter John MacClean.

On August 30, 1984, Defendants borrowed $21,000 from MacLean. In return, Defendants, jointly and severally, executed and delivered to MacLean a $21,000 promissory note (1984 note), which required them to repay the loan, plus interest at a rate of ten percent per annum, in monthly installments of $172.60, beginning on September 30, 1984. The note provided that if, after five years from the due date of the first payment, Defendants still owed principal and/or interest under the note, they were liable for the full amount outstanding on that date. To secure the note, Defendants executed a purchase money mortgage (1984 mortgage) on a three-acre parcel of land they owned in Keahialaka, Puna, creating a lien on the property pursuant to Hawai'i Revised Statutes (HRS) chapter 506,[2] in favor of MacLean. The mortgage was recorded at the State of Hawai'i Bureau of Conveyances (the Bureau of Conveyances).

On March 19, 1985, Defendants borrowed an additional $6,250 from MacLean and jointly and severally executed a promissory note (1985 note) for this loan with an interest rate of eleven percent per annum. Under the terms of the note, monthly payments of $135.90 were to begin on May 19, 1985, and Defendants were liable for the full amount outstanding after five years. To secure the note, Defendants executed purchase money mortgages (1985 mortgages) on two parcels of land they owned in Waiakahiula, Puna, again creating liens on the property in favor

of MacLean. Both mortgages were recorded at the Bureau of Conveyances.

MacLean died on March 2, 1989 in King County, Washington. As of that date, Defendants had not paid any amounts owed on either the 1984 or 1985 promissory notes.

Plaintiff, as MacLean's personal representative, attempted to collect on the promissory notes after MacLean's death. After this attempt failed, Plaintiff brought a foreclosure action against Defendants and Ke'opi'o O Puna,[3] a nonprofit organization that claimed an interest in the subject property arising from a lease agreement.[4] Ke'opi'o O Puna failed to answer Plaintiff's complaint, and Plaintiff obtained an entry of default against the organization on October 23, 1991.

In the meantime, Plaintiff filed a motion for summary judgment and interlocutory decree of foreclosure, which the court denied on February 20, 1991. Plaintiff again moved for summary judgment and interlocutory decree of foreclosure on September 17, 1991. A hearing on the motion was held on October 3, 1991, at which Defendants and Ke'opi'o O Puna failed to appear. On November 22, 1991, the court issued its Findings of Fact, Conclusions of Law, Order Granting Motion for Summary Judgment and for Interlocutory Decree of Foreclosure (summary judgment order), in favor of Plaintiff and against Defendants.

As to the 1984 note, the court found that Defendants were in default and Plaintiff was

2. Hawai'i Revised Statutes (HRS) § 506–1 (1985) provides, in relevant part, as follows:

> **Lien of mortgages of real property or fixtures; debts secured; priority.** (a) Every transfer of an interest in real property or fixtures made as security for the performance of another act or subject to defeasance upon the payment of an obligation, whether the transfer is made in trust or otherwise, is to be deemed a mortgage and shall create a lien only as security for the obligation and shall not be deemed to pass title.

3. In a document entitled, "Objection and Judicial Notice, Evidence Rule 201," filed January 7, 1993, Defendant–Appellant Frederick Hering

Kekaulike Baker, Jr. (Frederick) designates himself as "kahu" of Ke'opi'o O Puna, which he describes as "a non-profit tax-exempt 501(c)(3) Cultural Academy." "Kahu" is defined as "[h]onored attendant, guardian, nurse, ... regent, keeper, administrator, warden, caretaker, master, mistress[.]" M. Pukui & S. Elbert, *Hawaiian Dictionary* 113 (1986).

4. Plaintiff-Appellee Sam Nishitani (Plaintiff) refers to this agreement as "Contract Agreement to Lease the Subject Property," dated November 25, 1984, recorded at the State of Hawai'i Bureau of Conveyances in Liber 18300, and renewed for five years beginning November 26, 1987, by agreement dated July 6, 1987.

entitled to enforce the note,[5] with amounts due and owing to Plaintiff as follows:

| | |
|---|---|
| Principal balance | $21,000.00 |
| Accrued interest (from 9/30/84 to 10/18/91) | 14,794.75 |
| Late charges (from 2/28/85 to 10/18/91) | 2,110.77 |
| **TOTAL:** | **$37,905.52** |

The court also found that Defendants were responsible for interest on the principal amount, which was continuing to accrue at the rate of $5.75 per day, in addition to other charges, costs, taxes, insurance, and attorney fees.

In regard to the 1985 note, the court found that (1) the 1985 mortgages on the Waiakahiula properties were valid first mortgages and liens belonging to MacLean's estate; (2) Defendants were in default under the terms of the note; and (3) Plaintiff was entitled to foreclose on the 1985 mortgages. The court found that the amounts due and owing to Plaintiff under the 1985 note were as follows:

| | |
|---|---|
| Principal balance | $ 6,250.00 |
| Accrued Interest (from 3/19/85 to 10/18/91) | 4,526.04 |
| Late charges (from 5/19/85 to 10/18/91) | 1,046.43 |
| **TOTAL:** | **$11,822.47** |

In addition, the court found that Defendants were responsible for interest on the principal amount, which was continuing to accrue at the rate of $1.88 per day, in addition to other charges, costs, taxes, insurance, and attorney fees.

Finally, the court found that Plaintiff had the right to terminate the lease contract between Defendants and Ke'opi'o O Puna.

The court concluded that Plaintiff was entitled to summary judgment as to the issues of liability and damages, and authorized and directed the court-appointed Commissioner to take possession of the Waiakahiula properties, collect rent, publish notice of foreclosure, and sell the property at public auction.

### B. Procedural History

On December 26, 1991, Defendants appealed the summary judgment order (Appeal No. 15821), but the Hawai'i Supreme Court dismissed the appeal for lack of jurisdiction because final judgment had not been entered as to Ke'opi'o O Puna, and the summary judgment order being appealed from had not been certified as a final judgment pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 54(b).

On April 8, 1992, Defendants filed a second appeal (Appeal No. 16040), this time from the circuit court's Order on Commissioner's Motion for Instructions, filed March 10, 1992.[6] Plaintiff again moved to dismiss the appeal. The supreme court granted the motion to dismiss, stating that (1) Defendants had appealed an interlocutory order without proper leave of court; (2) final judgment had not been entered against Ke'opi'o O Puna; and (3) judgment against Defendants had not been certified pursuant to HRCP Rule 54(b).

On April 14, 1992, K. Napua Brown (Brown), who was appointed as substitute Commissioner to sell the mortgaged properties, filed a report recommending that the court approve the public sale of the two Waiakahiula lots to Plaintiff, as Plaintiff was the highest bidder for both lots, at $15,000

---

5. Defendants-Appellants Frederick Hering Kekaulike Baker, Jr. and Haunani Young–Baker (collectively, Defendants) apparently sold the Keahialaka, Puna property to Teruo and Natsuo Obayashi (collectively, the Obayashis) in 1987. According to the "Private Contract and Release of Mortgage" between Defendants and MacLean, attached as Exhibit F of Plaintiff's Amended Complaint, MacLean released the mortgage on the Keahialaka property to enable Defendants to issue a warranty deed to the Obayashis.

6. K. Napua Brown (Brown), who was appointed as substitute Commissioner on December 12,

1991, attempted to conduct a site inspection of the subject property on January 9, 1992. According to Brown's affidavit, she identified herself upon arrival, but Frederick accused her of trespassing and refused to answer questions about the property.

Because Brown did not feel free to conduct the site inspection, she filed a Motion for Instructions on January 13, 1992, requesting that a sheriff accompany her onto the premises.

and $12,500. According to the report, these bids were fair and reasonable in light of the circumstances.

Plaintiff filed a motion for an order approving and confirming Brown's report on May 22, 1992. Defendants filed an objection to the order in the circuit court clerk's office on June 4, 1992, the day the hearing on the motion was scheduled; however, they failed to appear at the hearing.

The circuit court granted Plaintiff's motion and filed its July 7, 1992 Order. The court concluded, among other things, that (1) the Commissioner's sale of the property was legally and fairly conducted; (2) Plaintiff's combined bid of $27,500 was fair and equitable under the circumstances; and (3) as of June 19, 1992, the following amounts were due and owing to Plaintiff from Defendants:

AUGUST 30, 1984 NOTE

| | | |
|---|---|---|
| d. | Principal amount | $21,000.00 |
| e. | Accrued interest from 9/30/84 to 6/19/92 at the rate of $5.75 per day | 16,203.50 |
| f. | Late charges at the rate of $17.26 per month from 2/28/85 to 1/30/86 and $27.75 per month from 2/28/86 to 10/18/91 | 2,110.77 |
| | SUBTOTAL | $39,314.27 |

MARCH 19, 1985 NOTE

| | | |
|---|---|---|
| a. | Principal amount | 6,250.00 |
| b. | Accrued interest from 3/19/85 to 6/19/92 at the rate of $1.88 per day | 4,986.64 |
| c. | Late charges at the rate of $13.59 per month from 5/19/85 to 10/18/91 | 1,046.43 |
| | SUBTOTAL | $12,283.07 |
| | **TOTAL** | **$51,597.34** |

In addition, the court found that interest continued to accrue, from and including June 20, 1992 to the date of disbursement of funds by the Commissioner, at the rate of $5.75 per day on the 1984 note and $1.88 per day on the 1985 note.

On August 10, 1992, Defendants, proceeding *pro se*, filed this appeal from the July 7, 1992 Order (Appeal No. 16372).[7] Plaintiff thereafter filed a motion to dismiss the appeal for lack of appellate jurisdiction, or in the alternative, to strike Defendants' opening brief. Meanwhile, on September 28, 1992, the circuit court issued an Order Granting Plaintiff's Motion for Deficiency Judgment against Defendants in the amount of $44,370.50, plus costs and attorney fees incurred after June 30, 1992.

On December 15, 1992, the supreme court, relying on *Security Pacific Mortgage Corp. v. Miller*, 71 Haw. 65, 783 P.2d 855 (1989), denied Plaintiff's motion to dismiss Appeal No. 16372, stating that "a deficiency judgment does not have to be entered before an appeal can be taken in this case[.]" Acknowledging that Plaintiff had previously obtained an entry of default against Keʻopiʻo O Puna, the court then ordered Plaintiff to either dismiss the claim against Keʻopiʻo O Puna or secure a final judgment against the organization in circuit court. The Third Circuit Court granted final judgment in favor of Plaintiff and against Keʻopiʻo O Puna on January 14, 1993.

## II. *ISSUES ON APPEAL AND STANDARDS OF REVIEW*

Defendants raise the following twelve arguments in their opening brief: (1) the burden of proving the amounts due on the promissory notes and Defendants' default thereof rested with Plaintiff, who failed to meet such burden; (2) the validity and interpretation of MacLean's will, which was never produced during this action, are questionable; (3) MacLean and Defendants had entered into a

---

7. In the meantime, Plaintiff moved for final judgment against Keʻopiʻo O Puna. The Third Circuit Court granted the motion on January 14, 1993.

valid "Private Contract and Release of Mortgage," which the circuit court completely ignored; (4) the doctrine of laches bars Plaintiff's claim, since over four years have passed since the promissory notes and mortgages were executed; (5) Plaintiff did not prove jurisdiction; (6) Defendants were denied due process of law and equal protection and "deprived of defending the security of their home" because the circuit court lacked jurisdiction over them; (7) the circuit court was biased; (8) Defendants were deprived of due process and equal protection because Plaintiff failed to properly serve a number of documents under HRCP Rule 5; (9) throughout the proceedings, the attorneys and court officers engaged in legal "trickery" and "deceit"; (10) court officers supported Plaintiff's attorneys "to amend a court cancellation"; (11) Plaintiff's attorneys and court officers misrepresented facts "as a means to cover up their tracks of error"; and (12) Plaintiff's attorneys and court officers worked in concert to "perpetuate a conspiracy" against Defendants.

Inasmuch as Defendants are appealing the circuit court's July 7, 1992 Order, we review Defendants' points on appeal with regard to the court's findings of fact and conclusions of law as stated in that order.

 "On appeal, the trial court's findings of fact are reviewed under the 'clearly erroneous' standard." *In re Doe,* 77 Hawai'i 435, 438, 887 P.2d 645, 648 (1994). " 'A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is left with a definite and firm conviction that a mistake has been made.' " *State v. Okumura,* 78 Hawai'i 383, 392, 894 P.2d 80, 89 (1995) (quoting *State v. Miller,* No. 16677, slip op. at 16, —— Hawai'i ——, ——, —— P.2d ——, ——, 1995 WL 8083 (App. Jan. 9, 1995), *reconsideration denied,* 77 Hawai'i 501, 889 P.2d 78, *cert. granted,* 78 Hawai'i 421, 895 P.2d 172 (1995)).

 Conclusions of law, however, are not binding on an appellate court and are freely reviewable for their correctness. We thus review the conclusions of law *de novo,* under the right/wrong standard. *Diaz v. Oahu Sugar Co.,* 77 Hawai'i 152, 155, 883 P.2d 73, 76 (1994).

## III. DISCUSSION

### A. Plaintiff's Right to Enforce the Promissory Notes

 Defendants' first three arguments on appeal, listed in part II above, challenge generally Plaintiff's right to enforce the promissory notes executed by Defendants.

However, Defendants did not appeal from the November 22, 1991 summary judgment order that determined that Defendants were liable to Plaintiff under the two promissory notes and that Plaintiff was thus entitled to a deficiency judgment against Defendants. Pursuant to *Security Pac. Mortgage Corp. v. Miller,* 71 Haw. at 71, 783 P.2d at 858, and *International Sav. & Loan Ass'n v. Woods,* 69 Haw. 11, 20, 731 P.2d 151, 156 (1987), Defendants have thus waived their right to challenge the liability and entitlement to damages issues determined by the summary judgment order.

### B. Laches

 Defendants next argue that the doctrine of laches bars Plaintiff's complaint because there were "many changes in the relationship and agreement(s) between Mr. MacLean and the [Defendants]," namely that, as mutually agreed between the parties, "payments were made on account" and "other valuable consideration was also accepted in lieu of payments." We disagree that the doctrine of laches bars this lawsuit.

The doctrine of laches reflects the equitable maxim that "equity aids the vigilant, not those who slumber on their rights." Where applicable, it acts to bar a court from considering an equitable action ... because of a perception that it is more equitable to defendants and important to society to promote claimant diligence, dis-

courage delay and prevent the enforcement of stale claims.

*Adair v. Hustace,* 64 Haw. 314, 320–21, 640 P.2d 294, 300 (1982) (citations omitted). In order for the doctrine to apply, two conditions must be present:

> First, there must have been a delay by the plaintiff in bringing his claim, and that delay must have been unreasonable under the circumstances. Delay is reasonable if the claim was brought without undue delay after plaintiff knew of the wrong or knew of facts and circumstances sufficient to impute such knowledge to him. Second, that delay must have resulted in prejudice to defendant. Common but by no means exclusive examples of such prejudice are loss of evidence with which to contest plaintiff's claims, including the fading memories or deaths of material witnesses, changes in the value of the subject matter, changes in defendant's position, and intervening rights of third parties.

*Id.* at 321, 640 P.2d at 300 (citations omitted).

MacLean died in 1989. Shortly thereafter, Plaintiff, on behalf of MacLean's estate, sought to collect on the 1984 and 1985 promissory notes, which, by their terms, became due in full five years after their execution. When Defendants failed to pay the sums owed, Plaintiff filed this action in October 1990, seeking a deficiency judgment and foreclosure on the mortgaged properties, which he was entitled to do under the terms of the 1984 and 1985 mortgages. Based on

these facts, we conclude that Plaintiff did not unreasonably delay in bringing this claim. On the contrary, Plaintiff acted reasonably and with due diligence in exercising his option to demand payment in full on the notes and, when that failed, in filing the present action.

We also conclude that Defendants did not suffer prejudice due to any delay by Plaintiff in bringing this claim. Because Plaintiff did not unreasonably delay in bringing this claim and because Defendants did not suffer prejudice, we hold that the doctrine of laches does not bar Plaintiff's claim.

### C. Jurisdiction

Defendants, who claim to be "by birth Hawaiian," next contend that they were denied due process of law and equal protection and "deprived of defending the security of their home" because the circuit court did not have jurisdiction over them. The basis of their challenge is not entirely clear; we gather from the arguments in the opening brief and record on appeal, however, that their jurisdictional challenge is grounded in one or both of the following concepts: [8] (1) as "birth descendants of Native Hawaiians, who inhabited the Hawaiian Islands prior to 1778," Defendants are generally not subject to the government and courts of the State of Hawai'i; and (2) the Hawai'i courts' assertion of jurisdiction over Defendants gives rise to a political question.[9] We consider each of these concerns in turn.

---

8. In response to Plaintiff's motion for summary judgment and interlocutory decree of foreclosure, Defendants filed a Notice of Special Appearance, "for the sole purpose of challenging the jurisdiction" of the circuit court. Defendants filed this document on October 2, 1991, the day before the scheduled hearing on the summary judgment motion. According to the court's Findings of Fact, Conclusions of Law, Order Granting Motion for Summary Judgment and for Interlocutory Decree of Foreclosure, filed November 22, 1991, Defendants failed to appear at the October 3, 1991 hearing. On October 23, 1991, Defendants filed another document entitled, "Objection Due to Fraud, Lack of Jurisdiction and Prejudice and Bias of the Court President."

9. Defendants provide the following argument to support their jurisdictional challenge:

> [Defendants] are Hawaiian by birth, as pursuant to the Hawaiian Homes Commission Act of 1920, thereby invoking a Political Question in reference to a State court over their person.
> Hawai'i is unique in that a recognized nation throughout the world was *not* overthrown, contrary to popular belief, as can be evidenced in President Cleveland's address, which was based on the James Blount reports, whereby he states that the handful of individuals were not acting on behalf of the United States, and they (those making up the Provisional Government) had no authority to bring the Island Kingdom of Hawai'i under the Jurisdiction of

### 1.

We reject the first concept—that Defendants, as "birth descendants of Native Hawaiians," are not subject to the government and courts of the State of Hawai'i—in light of our recent decision in *State v. Lorenzo*, 77 Hawai'i 219, 883 P.2d 641 (App.1994). *See also State v. French*, 77 Hawai'i 222, 883 P.2d 644 (App.1994).

In *Lorenzo*, a criminal defendant claimed in his defense that the Hawai'i state courts did not have jurisdiction over him because he was a citizen of the Kingdom of Hawai'i (Kingdom), an independent sovereign nation. Although the basis for his defense was less than clear, the defendant appeared to be arguing that, as a "citizen of the Kingdom," he was immune from being tried in the courts of the State of Hawai'i. We rejected this argument, noting that although the governments of the State of Hawai'i and the United States had recently acknowledged the illegality of the overthrow of the Kingdom, neither recognizes that the Kingdom exists at the present time. *Id.* at 221, 883 P.2d at 643. Because the defendant had "presented no factual (or legal) basis for concluding that the Kingdom exists as a state in accordance with recognized attributes of a state's sovereign nature," we determined that the defendant had failed to meet his burden under HRS § 701–115(2) (1993) [10] of proving his defense of lack of jurisdiction. *Id.* at 221, 883 P.2d at 643.

In retrospect, our statement in *Lorenzo* that a criminal defendant has the burden of proving his or her defense of lack of jurisdiction may have generated some confusion. HRS § 701–114(1)(c) (1993) specifically provides that in a criminal case, a defendant may not be convicted unless the State proves beyond a reasonable doubt "(f)acts establishing jurisdiction." The burden of proving jurisdiction thus clearly rests with the prosecution. *See State v. Kwak*, 80 Hawai'i 297, 301, 909 P.2d 1112, 1116 (1995).

However, where immunity claims are raised as a defense to jurisdiction, the burden is on the defendant to establish his or her immunity status. *See United States v. Noriega*, 746 F.Supp. 1506, 1524–25 (S.D.Fla. 1990) (claim of diplomatic immunity as a defense to narcotics-related offenses failed where defendant offered no proof supporting the defense); *United States v. Lumumba*, 578 F.Supp. 100, 103 (S.D.N.Y.1983) (Vice–President and Minister of Justice for the Provisional Government of the Republic of New Africa (RNA) not entitled to diplomatic immunity from criminal prosecution absent proof that RNA had been recognized by the United States Department of State as an entity whose officials were entitled to diplomatic immunity); *State v. Davis*, 745 S.W.2d 249 (Mo.App.1988) (defendant who claimed to be a citizen and ambassador of the Kingdom of God not entitled to diplomatic immunity in prosecution for driving without a license because there was nothing in the record to indicate that organization to which defendant belonged had been recognized as a foreign state by the executive branch of the federal government, or that Department of State had granted immunity status to Defendant). In *Lorenzo*, the defendant was essentially claiming that the trial court lacked jurisdiction over him because as a citizen of the Kingdom, he was immune from being tried in a court of the State of Hawai'i.

Therefore, although the prosecution had the burden of proving beyond a reasonable

---

the State. In the Supreme Court ruling regarding Hawai'i's annexation, the justices were clear and unambiguous in their ruling, whereby they stated: "... to make a treaty of *Political* and *Commercial* union with the United States." *Kawananakoa v. Polyblank*, 205 U.S. 349, 27 S.Ct. 526, 51 L.Ed. 834.

Whereby, the State of Hawai'i was created and evolved solely out of "ADMIRALTY JURISDICTION", to encompass the non-Hawaiians who were living in Hawai'i at the time of its' [sic] inception. By the state being created this way, it placed the People of the Land, the "Hawaiians" by birth, into a "status" where they were not subjected to the JURISDICTION of this Admiralty created entity, thereby giving rise to the "POLITICAL QUESTION".

**10.** HRS § 701–115(2) (1993) provides in relevant part: "No defense may be considered by the trier of fact unless evidence of the specified fact or facts has been presented."

doubt facts establishing jurisdiction, the defendant had the burden of proving facts in support of any defense, such as immunity, which would have precluded the court from exercising jurisdiction over the defendant.

In the present case, similar principles apply. Plaintiff asserted in his Amended Complaint, and Defendants did not dispute, that (1) Defendants are residents of the State of Hawai'i; (2) the subject real properties are located in the County of Hawai'i, State of Hawai'i; (3) Defendants entered into and executed the 1984 and 1985 promissory notes and respective mortgages with MacLean; and (4) Defendants had not paid MacLean any amounts under the terms of the promissory notes.

With these assertions, Plaintiff established at least a prima facie showing that Defendants were subject to the jurisdiction of the circuit court.[11] Defendants have produced no evidence in support of their defense that as "birth descendants of Native Hawaiians, who inhabited the Hawaiian Islands prior to 1778," they enjoy immunity from a civil suit regarding contracts entered into by them in the State of Hawai'i. We conclude, therefore, that Defendants have failed to meet their burden of establishing, by a preponderance of the evidence, their defense of immunity and of overcoming Plaintiff's prima facie showing of jurisdiction in this matter.

### 2.

■ We next consider whether the circuit court's assertion of jurisdiction over Defendants raises a political question, thereby rendering the issues in this case nonjusticiable.

■ The political question doctrine, often considered the most amorphous aspect of justiciability, holds generally that certain

matters are political in nature and thus inappropriate for judicial review. 1 R. Rotunda & J. Nowak, *Treatise on Constitutional Law: Substance and Procedure* § 2.16, at 275 (2d ed.1992 and Supp.1996). It is through this doctrine that "the judiciary attempts to avoid an improper interference with the political judgments of the other branches of the ... government." K. Ripple, *Constitutional Litigation* § 3–7, at 96 (1984) (footnote omitted).

The Hawai'i Supreme Court has embraced the United States Supreme Court's view of the political question doctrine and applied it to our state government, recognizing that "the use of 'judicial power to resolve public disputes in a system of government where there is a separation of powers should be limited to those questions capable of judicial resolution and presented in an adversary context.'" *Trustees of the Office of Hawaiian Affairs v. Yamasaki*, 69 Haw. 154, 171, 737 P.2d 446, 456 (quoting *Life of the Land v. Land Use Comm'n*, 63 Haw. 166, 171–72, 623 P.2d 431, 438 (1981)), *cert. denied*, 484 U.S. 898, 108 S.Ct. 234, 98 L.Ed.2d 192 (1987).

The leading decision in regard to the political question doctrine is *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), *on remand*, 206 F.Supp. 341 (M.D.Tenn. 1962), a civil rights lawsuit which challenged, as arbitrary and capricious, a Tennessee statute reapportioning the seats in the Tennessee General Assembly. Concluding that the complaint presented a matter "unsuited to judicial inquiry or adjustment," the district court dismissed the case.

On appeal, the United States Supreme Court addressed the justiciability issue by initially surveying a number of prevailing political question cases. The Court then attempted to formulate a set of standards for determining whether the doctrine should ap-

---

11. HRS § 603–21.5 (1993) provides generally that "[t]he several circuit courts shall have jurisdiction ... of ... [c]ivil actions and proceedings[.]" Pursuant to HRS § 603–36 (1993), moreover, "[a]ctions and proceedings of a civil nature within the jurisdiction of the circuit courts shall ... [unless specified otherwise] ... be brought in the circuit where the claim for relief arose or where the defendant is domiciled; provided if there is more than one defendant, then the action shall be brought in the circuit in which the claim for relief arose unless a majority of the defendants are domiciled in another circuit, whereupon the action may be brought in the circuit where the majority of the defendants are domiciled."

ply in a particular case. Observing that "'the appropriateness under our system of government of attributing finality to the action of the political departments and also the lack of satisfactory criteria for a judicial determination are dominant considerations[,]'" *Baker*, 369 U.S. at 210, 82 S.Ct. at 706 (quoting *Coleman v. Miller*, 307 U.S. 433, 454–55, 59 S.Ct. 972, 982, 83 L.Ed. 1385 (1939)), the Supreme Court fashioned the following oft-quoted test to determine when the political question doctrine should be invoked:

Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for nonjusticiability on the ground of a political question's presence.*

*Baker*, 369 U.S. at 217, 82 S.Ct. at 710 (emphasis added); also quoted in *Trustees of the Office of Hawaiian Affairs*, 69 Haw. at 170, 737 P.2d at 455.

Areas that have generally been deemed to involve nonjusticiable political questions include (1) foreign policy formulation; (2) exercise of war-making powers; (3) ratification of amendments to the United States Constitution; (4) challenges to activities at political party conventions; (5) determinations of whether state procedures violate the Guaranty Clause of article IV, section 4 of the United States Constitution[12]; (6) impeachment proceedings; (7) Indian affairs; (8) cases of alleged political gerrymandering; and (9) cases arising under the Origination Clause of article I, section 7 of the United States Constitution.[13] 1 R. Rotunda & J. Nowak § 2.16, at 281–94 and Supp.1996 at 36–9.

Unlike these subject areas, however, the instant case does not present us with any of the *Baker* "formulations" characteristic of a nonjusticiable political question that would preclude a state court from addressing the merits of this case. The relevant question before the circuit court was not, as Defendants maintain, whether "the State of Hawai'i was created and evolved solely out of 'ADMIRALTY JURISDICTION'" to which Native Hawaiians were not subject. Rather, the relevant issue was simply whether the promissory notes and mortgages entered into by Defendants and MacLean were enforceable. We believe that the circuit court properly had jurisdiction to address the latter issue.

### D. *Failure to Serve*

Defendants' final contentions include allegations of legal "trickery" and "deceit" by the court officers and attorneys, fraud, misrepresentation, perpetuation of a conspiracy, and bias of the circuit judge.

 However, the only support Defendants offer for these allegations is a claim that court officers and Plaintiff's attorneys

---

**12.** Article IV, section 4 of the United States Constitution provides as follows:

The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic violence.

**13.** Article I, section 7 of the United States Constitution provides as follows:

All Bills for raising Revenue shall originate in the House of Representatives[.]

failed to serve them with "various court filings," thereby violating HRCP Rule 5. As a result, Defendants claim their rights to due process and equal protection were also violated. Defendants refer to only one document, entitled "Substitution of Commissioner," in their opening brief as not having been served upon them. Such failure, they argue, "was the direct result of the Defendants being subjected to selective and vindictive persecution and unwarranted harassment in the privacy of their home."

The record reveals that in its November 22, 1991 summary judgment order, the circuit court appointed J. Richard Peterson (Peterson) as Commissioner, authorizing him to take possession of the foreclosed property and arrange for its sale in accordance with HRS § 667-5. A copy of the order was served on Defendants by mail on November 25, 1991.

On December 12, 1991, however, for reasons not apparent to us, the court named Brown as substitute Commissioner in place of Peterson in a document entitled "Substitution of Commissioner." The appended certificate of service indicates that copies of the document were sent to Peterson and Brown, but not to Defendants.

HRCP Rule 5(a) provides that, in addition to all orders, pleadings, and discovery papers, "every written notice, appearance, demand, brief or memorandum of law, offer of judgment, bill of costs, designation of record on appeal, and similar paper *shall be served upon each of the parties affected thereby* [.]" (Emphasis added.) Since Defendants would have been "affected" by the notice of substitution, we agree that Plaintiff's failure to serve them violated HRCP Rule 5(a). However, based on our review of the record in this case, we conclude that such failure did not affect Defendants' substantial rights and was, thus, harmless error. HRCP Rule 61.[14]

The November 22, 1991 summary judgment order expressly notified Defendants that Peterson had been appointed Commissioner to commence the foreclosure and sale process. When Brown showed up to conduct a site inspection of Defendants' property on January 9, 1991, therefore, we can appreciate that Defendants may have been reluctant to allow Brown onto their property without official notification that Brown was authorized to be there.

The record indicates, however, that Brown did inform Defendants that she had been appointed substitute Commissioner. Moreover, Brown subsequently filed a motion seeking the circuit court's instructions as to how she should proceed to carry out her duties as substitute Commissioner in view of Defendants' refusal to allow her onto their property. Defendants were served with copies of this motion, the notice of the hearing on the motion, and Plaintiff's memorandum in support of the motion. Defendants were clearly on notice that Brown had been appointed substitute Commissioner, and we fail to see how a lack of notice of the substitution substantively affected Defendants' rights to due process and equal protection. If Defendants had reasons to oppose the appointment of Brown as substitute Commissioner, they did not indicate so in their brief.

## IV. CONCLUSION

For the foregoing reasons, we conclude that Plaintiff, as Personal Representative Under the Will and of the Estate of Mac-Lean, is entitled to enforce the promissory notes and mortgages entered into and executed by MacLean and Defendants. Accordingly, we affirm the circuit court's July 7, 1992 Order Approving Report of Commissioner, Confirming Sale of Real Property at Public Auction, and Directing Distribution of Proceeds.

---

14. Hawai'i Rules of Civil Procedure Rule 61 provides, in relevant part, that "no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."